1

2   M. Taylor Florence, SBN 159695
    Daniel T. Rockey, SBN 178604
3   Sunita Koneru, SBN 227032
    BULLIVANT HOUSER BAILEY PC
4   601 California Street, Suite 1800
    San Francisco, California 94108
5   Telephone:  415.352.2700
    Facsimile:   415.352.2701
6   E-mail: taylor.florence@bullivant.com
            dan.rockey@bullivant.com
7           sunita.koneru@bullivant.com

8   Micah R. Jacobs, SBN 174630
    MBV Law, LLP
9   855 Front Street
    San Francisco, California 94111
10  Telephone:  415.781.4400
    Facsimile:   415.433.6563
11  E-mail: mjacobs@mbvlaw.com

12  Attorneys for Plaintiffs,
    JONATHAN BISSOON-DATH and
13  JENNIFER BARRETTE-HERZOG

14

15                  UNITED STATES DISTRICT COURT

16                  Northern DISTRICT OF CALIFORNIA

17  JONATHAN BISSOON-DATH and          Case No.: CV08-1235 MHP
    JENNIFER BARRETTE-HERZOG,
18                                     **DECLARATION OF MICAH R. JACOBS**
                    Plaintiffs,        **IN SUPPORT OF REQUEST FOR**
19                                     **DENIAL OR CONTINUANCE OF**
              vs.                      **SUMMARY JUDGMENT UNDER FRCP**
20                                     **RULE 56(F)**

21  SONY COMPUTER ENTERTAINMENT
    AMERICA, INC., DAVID JAFFE, and DOES   Date:        December 21, 2009
22  1 THROUGH 100, inclusive,              Time:        2:00 p.m.
                                           Courtroom:   15
23                  Defendants.            Judge:       Honorable Marilyn Hall Patel

24

25

26

27

28

                                  – 1 –

1    I, Micah R. Jacobs, hereby declare as follows:

2    1.    I am an attorney duly licensed to practice before this Court, and I am one of the

3    lead attorneys who has represented Plaintiffs Jonathan Bissoon-Dath ("Dath") and Jennifer

4    Barrette-Herzog ("Herzog") (collectively, "Plaintiffs") in this action.  I am currently a partner of

5    the firm MBV Law, LLP in San Francisco.  Until recently, I was a shareholder at Bullivant

6    Houser Bailey PC.  The two firms are now co-counsel for Plaintiffs.  I have personal knowledge

7    of the facts stated herein having represented Plaintiffs for most of this lawsuit and during the

8    discovery that has been conducted in this action.  If called upon to do so, I could testify

9    competently to the facts set forth herein.

10    2.    I submit this Declaration under FRCP Rule 56(f), respectfully requesting the

11    Court to deny or continue Defendants Sony Computer Entertainment America, Inc. ("Sony")

12    and David Jaffe's ("Jaffe") (collectively, "Defendants") Motion for Summary Judgment (the

13    "Motion") and permit Plaintiffs to pursue additional discovery that I am confident will lead to

14    facts that are essential to Plaintiffs' ability to oppose the pending Motion. Rule 56(f) provides:

15    "If a party opposing the motion shows by affidavit that, for specified reasons, it cannot present

16    facts essential to justify its opposition, the court may: (1) deny the motion; (2) order a

17    continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be

18    undertaken; or (3) issue any other just order."

19    3.    I believe that summary judgment is inappropriate based even on the existing

20    record.  However, there are critical facts essential to Plaintiffs' ability to oppose the Motion that

21    exist but which we are unable to properly present at this time.  Plaintiffs are not at fault for

22    being unable to present these facts at this time, because this Court's initial Scheduling Order

23    ("Order") issued at the outset of this case limited Plaintiffs to just five (5) depositions prior to

24    summary judgment.  Notably, that Order issued before Defendants had even answered the

25    Complaint and before they provided <u>any</u> discovery to Plaintiffs, other than their self-serving

26    initial disclosures.  A true and correct copy of the Court's August 25, 2008 Scheduling Order is

27    attached hereto as **Exhibit 1**.

28

– 2 –

DECLARATION OF MICAH R. JACOBS IN SUPPORT OF REQUEST FOR
DENIAL OR CONTINUANCE OF SUMMARY JUDGMENT UNDER FRCP RULE 56(F)

4.      I reviewed the Reporter's Transcript of that August 25, 2008 Case Management Conference ("CMC"), a true and correct copy of which is attached hereto as **Exhibit 2**.  At that time, Plaintiffs were represented by the firm Kershaw, Cutter, Ratinoff & York, a Sacramento-based firm that specializes in personal injury cases.  During the CMC, Defendants' counsel Brooke Oliver represented to the Court that this case lacked merit and that Defendants wanted to file a Rule 12(b)(6) Motion to Dismiss.  The Court declined to permit such a motion and instead set out what I believe was a compromise, interim solution, wherein the Court stayed all discovery pending an early mediation.  The Order further stated that if mediation failed, which it did, then the Plaintiffs could have just five depositions on the issue of liability only, and then Defendants would have three months after that limited discovery concluded to prepare and file their motion for summary judgment on liability.

5.      It is not clear to me from the Reporters Transcript why or how the Court determined that five depositions would be sufficient to oppose the Motion and not prejudicial, especially considering that Defendants had not even responded to the Complaint or provided any discovery as of that time.  I suspect the Court restricted Plaintiffs to just five depositions as a compromise solution after rejecting Defendants' request to file a Rule 12(b) motion to dismiss, to see if Plaintiffs could make out even a plausible case, in which case discovery would be re-opened and the Plaintiffs would then be given the opportunity to actually prepare their case for trial.  On the other hand, if Plaintiffs' case actually lacked merit, as Mr. Oliver argued, or if Defendants could prove that Jaffe in fact wrote the *God of War* video game ("GOW") in 2001, as she also argued, then that should be apparent after just five depositions and Defendants would not have been subjected to overwhelming discovery.  Interestingly, the Order itself made no reference to expert discovery, nor did it say that this was the only discovery the Plaintiffs would ever be permitted before proceeding to trial; nor did it state that the normal rules regarding discovery cut-off dates and motions to compel otherwise applied to this interim Scheduling Order.

6.      During the CMC, Ms. Oliver seemed to suggest the record would be small, that only Jaffe wrote GOW and that Defendants could prove that he wrote the game in 2001, prior to

-3-

DECLARATION OF MICAH R. JACOBS IN SUPPORT OF REQUEST FOR
DENIAL OR CONTINUANCE OF SUMMARY JUDGMENT UNDER FRCP RULE 56(F)

1   the time Plaintiffs' Works were distributed. That seemed to be the sole basis of her desired

2   motion. In response to Your Honor's inquiry as to how much discovery Plaintiffs' might need,

3   Mr. Cutter made clear he had no idea how voluminous the record was (Cutter: "I can't speak for

4   Sony as to how voluminous the documents will be. I don't anticipate them to be particularly

5   voluminous, based on their initial Rule 26 disclosure.") or what affirmative defenses Defendants

6   would assert. Suffice it to say, the record turned out to be voluminous. Sony produced over

7   400,000 pages showing that Defendants wrote and developed GOW over a four-year period

8   starting with the four initial concept documents in 2001, which presented only what Jaffe called

9   the "seeds" for a game based on Greek mythology, and through the game's release in 2005.

10          7.      When Your Honor inquired of Ms. Oliver, "how many people were involved in

11  this whole operation?," she responded, "not that many people on the defense side." That also

12  turned out to be wrong – there were numerous people involved in this rather extensive

13  operation. Your Honor then said, "maybe you don't need to have a lot of discovery, given what

14  you are saying." When Mr. Cutter was asked by Your Honor what discovery Plaintiffs needed,

15  he appears to have thought only about deposing "the key people involved in the creation of the

16  game and look at the underlying documents. I think that would be the key discovery."

17  Unfortunately, he completely neglected to consider that Plaintiffs would need essential

18  discovery to prove that Defendants had "access" to Plaintiffs' Works. In his defense, the entire

19  dialogue at the CMC seemed more focused on Sony's argument that Jaffe wrote the story in

20  2001, as if that were the only issue that Defendants wanted to address in a motion for summary

21  judgment. In any event, Mr. Cutter was wrong when he said the only discovery that would be

22  necessary to properly oppose the Motion was limited exclusively to people involved in the

23  creation of the game. Finally, Your Honor made clear that you did not want discovery motions

24  and that if, after conducting this limited discovery and seeing Defendants' Motion, Plaintiffs

25  believed they needed additional discovery to adequately respond to the Motion, then the Court

26  preferred for Plaintiffs to file a 56(f) request "along with the opposition" (and not before), so

27  that Your Honor could see what Plaintiffs needed and whether it made sense to permit

28  additional discovery.

DECLARATION OF MICAH R. JACOBS IN SUPPORT OF REQUEST FOR
DENIAL OR CONTINUANCE OF SUMMARY JUDGMENT UNDER FRCP RULE 56(F)

1       8.     I substituted in as counsel with the Bullivant firm soon after that CMC, and have

2    been lead counsel for the past year.  Having now litigated this case with opposing counsel, and

3    having examined the voluminous (and yet incomplete) document production from Sony that

4    followed that CMC, and after interviewing many witnesses myself and seeing the Motion, it is

5    now my professional opinion that five depositions was woefully insufficient under the

6    circumstances, and that it would be extremely prejudicial to grant the Motion on that basis.

7       9.     Plaintiffs have certainly made the most of those five depositions, and presented

8    more than enough evidence in their opposition papers filed herewith, to show that Plaintiffs

9    have legitimate claims, that there are many material factual disputes concerning access, that

10   Jaffe did not write the story in 2001, as claimed, that the respective works are substantially

11   similar and that, therefore, summary judgment is not appropriate.  Nevertheless, I also know that

12   there remains critical evidence essential to this opposition that Plaintiffs can obtain if given the

13   opportunity.  While the parties previously stipulated to extend the time frame set forth in that

14   August 25, 2008 Scheduling Order, Sony steadfastly refused to enlarge the number of fact

15   depositions Plaintiffs could conduct.  Indeed, part of the reason I was forced to request and the

16   parties stipulated to extend the time deadlines was because the record was so voluminous and it

17   was impossible even to review the 360,000 pages of materials produced by Sony following that

18   CMC, in such a short time period, especially considering that Sony produced those 360,000

19   pages in no particular order – they were shuffled within each custodian – and it took me months

20   just to get a custodian index after I reported that the documents were not produced as they were

21   maintained in the normal course of business.  Nor did that index illuminate how to make any

22   sense of the manner in which those documents were produced.  Then, just 36 hours before the

23   key depositions were finally ready to commence, Sony produced another 45,000 pages of

24   materials, which also were shuffled in no particular order, and there was no possible way I could

25   have reviewed those documents before I flew to San Diego to depose Jaffe and my other four

26   witnesses.

27      10.    Of the five depositions Plaintiffs were permitted to take prior to summary

28   judgment, we were forced to use three of those to get discovery from Defendants.  **I deposed**

DECLARATION OF MICAH R. JACOBS IN SUPPORT OF REQUEST FOR
DENIAL OR CONTINUANCE OF SUMMARY JUDGMENT UNDER FRCP RULE 56(F)

1   **Sony Computer Entertainment America, Inc.**, via its persons most knowledgeable on certain

2   subjects relating to the conception and development of the accused video game, *God of War*,

3   and Defendants' production of documents. **I used a second deposition to depose defendant**

4   **David Jaffe**, the main author who claims to have written the story presented in *God of War*. **I**

5   **had to use a third deposition to depose Marianne Krawczyk**, who was the other main author

6   who Jaffe and Sony claimed wrote the story in *God of War*. **Those three depositions were**

7   **critical and could not be avoided.**

8          11.    That left me with **just two depositions to establish "access,"** a critical issue in

9   any copyright infringement case, and one that Plaintiffs' prior counsel did not even consider at

10  the CMC.  At the CMC, Ms. Oliver seemed to represent that Sony's Motion would be limited to

11  the issue of whether David Jaffe wrote God of War in 2001, before Plaintiffs' even distributed

12  their Works.  He did not, and Sony's Motion is not limited to that issue.  Rather, one of its

13  primary arguments now is that Plaintiffs have not met their burden of proving that Defendants

14  had a "reasonable possibility" of accessing Plaintiffs' Works.  While I believe that we have in

15  fact shown that Defendants, and Jaffe in particular, did have multiple opportunities to access

16  Dath's script, with just two depositions, there is still critical discovery that must be conducted to

17  properly respond to that issue.

18         12.    The fact is that **Plaintiffs sent their Works to over 60 agents, attorneys,**

19  **and/or production companies working in and around Los Angeles, each of whom, in turn,**

20  **had multiple script-readers and assistants.**  We were forced to choose just two of the more

21  than 60 or 70 known recipients of Plaintiffs' Works to depose.  Before making that difficult

22  decision, we reviewed the documents received from Defendants and I also issued several

23  document subpoenas to those agents who did receive the scripts.  Plaintiffs and I were then

24  forced to make a difficult judgment call on which of the more than 60 agents to depose.  For a

25  variety of reasons, we decided to depose the two largest and most influential talent agencies in

26  Hollywood, Creative Artists Agency ("CAA") and International Creative Management ("ICM"),

27  each of which had received and reviewed Dath's work *Olympiad* and each of whom also had

28  contacts with Defendants.  I believe we made the right decision and that we obtained sufficient

– 6 –

1    evidence to establish a "reasonable possibility" of access through either or both ICM and CAA,

2    at least with regard to the script *Olympiad*.

3        13.    Nevertheless, there are many other key witnesses to depose from whom

4    Defendants could have accessed Plaintiffs' Works, but we were unable to depose due to the

5    limitations on discovery.  We are not requesting additional discovery merely to go on a "fishing

6    expedition."  In fact, in response to our document subpoenas, many potential "access" witnesses

7    responded properly and I am quite comfortable not pursuing further discovery from them.

8    However, there are several key witnesses with whom I spoke who were rather difficult, to say

9    the least, or who refused to make any statement under oath voluntarily.

10        14.    For example, **a key witness whom I believe I must depose as a possible access**

11   **point was a producer named Michel Shane**.  The documents we do have show quite clearly

12   that Mr. Shane favored Dath's script *Olympiad* and wanted to make a movie out of it.  At that

13   time, Mr. Shane was a hot commodity in the entertainment industry because his recent film

14   *Catch Me If You Can* with Leonardo DiCaprio had just been released and it was a huge box

15   office success.  He could have made whatever film he wanted, and it appears from Mr. Shane's

16   own documents that he wanted to make Dath's script *Olympiad* into a motion picture.  The

17   problem was that Mr. Shane seems to have simply assumed that he owned the exclusive rights

18   to Dath's script.  Thus, he began immediately sharing it and communicating with others about it.

19   He sent the script to Jon Levin at CAA, whom we did depose, and represented to Mr. Levin that

20   he already owned the rights to the script.  He also told Mr. Levin in emails how excited he was.

21   Dath was excited also, but he was also concerned about Mr. Shane's belief that he had the

22   exclusive rights.  Dath flew to Los Angeles to meet with Mr. Shane, Mr. Levin and another

23   producer at CAA.  Just before that meeting, on January 22, 2003, Mr. Shane sent Dath an email

24   with a contract attached to it.  The form contract he attached was identified as a Sony document.

25   A true and correct copy of his email communication is attached hereto as **Exhibit 3**.  After the

26   meeting at CAA, the group seemed ready to move forward, Dath reports that Mr. Levin said

27   with reference to Dath's script, that he would start "taking it out."  Over the ensuing weeks,

28   after Mr. Shane had apparently spent time trying to put together a team to make this film, his

– 7 –

1    written communications with Dath reflect a total breakdown in communications, not because of

2    the quality of script itself, which he and Mr. Levin still liked, but more because of a dispute over

3    whether Mr. Shane actually owned any rights to run with the project as he was. **See Exh 3,**

4    **pages 33-39.**

5         15.    Based on my review of all of those email communications, copies of which are

6    attached to the Declaration of Jennifer Barrette-Herzog submitted in support of Plaintiffs'

7    opposition to the Motion, I had several telephone conversations with Mr. Shane during the

8    course of discovery. He remembered Dath, the script and their meetings, but he said he was

9    extremely frustrated by the whole experience. He was extremely professional during our

10   conversations, but politely refused to provide any testimony voluntarily, and he would not

11   discuss any of the details about his work to develop the project. I asked him to prepare and sign

12   an affidavit describing his experience, his communications with Mr. Levin at CAA, his efforts

13   to put a team together for this project and describing his contacts with Defendants and other

14   people with whom he shared Dath's script and why he thought he owned the rights to option it.

15   After speaking with his lawyer, he refused to provide any testimony voluntarily. I believe the

16   only way for me to pursue this critical avenue of discovery would be through the subpoena

17   power of this Court so that I can depose Mr. Shane.

18        16.    Another key witness that Plaintiffs need to depose is **Larry Shapiro**, who was

19   the head of the newly created gaming department at CAA in 2001 through 2003, but who no

20   longer works at CAA. As set forth in the deposition transcript of Seamus Blackley, which is

21   attached as Exhibit 7 of my Declaration in Opposition to the Motion, ("MRJ Decl.") Mr.

22   Shapiro was the head of that division and in fact launched the gaming division at CAA

23   sometime in between 2001 and 2003, when Mr. Blackley arrived. He also explained that Mr.

24   Shapiro was actively involved in trying to evangelize the convergence of gaming and traditional

25   entertainment and that he was actively involved in trying to find scripts and writers from the

26   motion picture department at CAA for use with his gaming clients; that he attended meetings

27   with Mr. Levin and other agents in the motion picture group (several of whom were in receipt of

28   Dath's script *Olympiad* at that time) where they discussed current projects; and that game

DECLARATION OF MICAH R. JACOBS IN SUPPORT OF REQUEST FOR
DENIAL OR CONTINUANCE OF SUMMARY JUDGMENT UNDER FRCP RULE 56(F)

1   developers would come to Mr. Shapiro when they had game projects and needed professional

2   writers to help with particular stories. This all seems to have been occurring at the same time

3   that Dath and Mr. Shane were meeting with Mr. Levin at CAA and when Sony and Jaffe were

4   looking to hire professional writers to help write their game on Greek mythology.

5          17.     Another key access point is an agent by the name of **Ken Sherman**, who

6   received three of Plaintiffs' Works. I served a subpoena on Mr. Sherman. I spoke with him

7   several times after that, and he was rather belligerent. He admitted that he had script readers

8   who worked with him and likely read Dath's Works, however, he would not provide a single

9   name or any other information. Nor would he discuss his contacts with Defendants or any other

10  Sony entity (he began his career working at Sony's Columbia Pictures). Plaintiffs received

11  "coverage" of one of their works by a script-reader named "Bruce." Plaintiffs believe that

12  "Bruce" worked for Ken Sherman. Mr. Sherman told me that maybe someone named Bruce

13  worked for him but he refused to check his records or submit any affidavit. I believe a

14  deposition subpoena is the only way that I can obtain critical discovery from Mr. Sherman.

15         18.     I believe it also critical to depose witness(es) to determine the relationship

16  between **Escape Artists and its principles, Chrissy and Jason Blumenthal, and Sony**

17  **Pictures Entertainment ("Sony Pictures"), and also Sony Pictures' relationship with the**

18  **Defendants**. We know that Escape Artists is/was a production company that is or was located

19  on the Sony Pictures "Lot" and that it received Dath's script. On several occasions we tried to

20  serve a subpoena, but the security guards at the front gate of the Sony Lot would not provide

21  access to the process server. We got several different stories as to whether or not Escape Artists

22  even existed and its relationship with Sony Pictures. The email communication that Ms.

23  Blumenthal had with Plaintiffs shows that Ms. Blumenthal used a Sony Pictures email address

24  (i.e., "spe.sony.com"). A true and correct copy of an example of Ms. Blumenthal's email

25  communication with Plaintiffs is attached hereto as **Exhibit 4**. After several attempts to serve a

26  subpoena, we were finally directed to attorneys who represented Sony Pictures. One attorney

27  confirmed that Escape Artists and its principles work on the Sony Lot and I got the impression

28  that they worked under a variety of different corporate entities depending upon the nature of the

– 9 –

1    project. We then served a subpoena on Sony Pictures for documents and deposition, and I was

2    planning to depose Sony Pictures rather than ICM. Interestingly, however, Defendant Sony

3    Computer Entertainment America, Inc. objected vigorously to permitting me to depose Sony

4    Pictures, claiming that Ms. Oliver did not have "reasonable notice." Although Sony Pictures

5    believed it had reasonable notice and was more than willing to appear for deposition, Ms.

6    Oliver's objections obstructed my efforts. I decided to depose ICM instead. Although Sony

7    Pictures later produced documents, including various "first look" contracts that must be

8    explored through deposition, I have been unable to get information about Sony Pictures'

9    relationship with Escape Artists and its principles. Likewise, I cannot get any satisfactory

10    information concerning Sony Pictures' interaction with Defendants. Defendants have produced

11    documents in this case establishing that Sony Pictures and Defendant Sony Computer

12    Entertainment America, Inc. were in fact sharing information and offering each other "first

13    looks" at various projects and "properties" that they each had rights to, during the critical time

14    period at issue here, to see if any games might make for a good movie and *vice-versa*. Also, I

15    have read publicly available articles that indicate that the parent company of both Sony entities,

16    Sony Corporation, was interested in the convergence of film and the gaming industry, including

17    an article, a true and correct copy of which is attached hereto as **Exhibit 5**, where a key

18    executive from Sony Pictures, Yair Landau, was interviewed about the convergence of film and

19    gaming, claiming that "Sony as a whole is committed to convergence of entertainment through

20    multiple platforms and will continue building out networked entertainment services for all forms

21    of content to be enjoyed on future consoles (PS3 and beyond) . . . ." There is no doubt in my

22    mind that Sony Pictures and Defendant Sony Computer Entertainment America, Inc. were

23    sharing at least some information and film or game properties, and that their respective

24    employees socialized and shared information. I believe we can prove that employees at Sony

25    Pictures must have known that Jaffe was writing a game based on Greek mythology at the same

26    time Escape Artists and Sony Pictures had possession of Dath's script on Greek mythology. I

27    believe there is evidence to be obtained showing the relationship between Sony Pictures and/or

28    Escape Artists and/or Defendants that would be essential on the issue of access. Indeed, in a

– 10 –

1    document produced by Defendants, Jaffe reviewed a list of available scripts that Sony Pictures

2    was offering to Defendants, and Jaffe requested the opportunity to get his hands on those scripts.

3    In another document we saw that employees of defendant Sony games would go the Sony

4    Pictures Lot to watch movies as a social event.  True and correct copies of examples of such

5    communications are attached hereto as **Exhibit 6**.

6         19.    Furthermore, there are also key witnesses who worked at Sony, and with Jaffe,

7    developing the game that we have been unable to depose, including, for example, **Whitney**

8    **Wade, Shannon Studstill, Rita Mines, and the two other credited authors, Keith Fay and**

9    **Alex Stein**, each of whom played critical roles in the development of GOW and has important

10   evidence on how the story was written, including how critical story elements came together

11   early in 2003 (not 2001).  Each of the aforementioned Sony employees are also potential access

12   points.

13        20.    I believe it would extremely prejudicial to rule against Plaintiffs on the issue of

14   access having allowed Plaintiffs the opportunity to take just two depositions based on

15   representations that the record would not be voluminous.  I believe Plaintiffs have made a *prima*

16   *facie* showing regarding the merits of their claims, evidence has established that Jaffe did not

17   write the story in 2001, as Ms. Oliver claimed at the initial CMC, and that crucial discovery

18   should now be permitted on issues that were not contemplated at that CMC.  Indeed, court

19   orders that stay discovery have been found to be good cause to deny or continue a motion for

20   summary judgment under Rule 56(f).  *See, e.g., DiMartini v. Ferrin*, 889 F.2d 922 (9th Cir.

21   1989).

22        21.    In addition to the need to conduct further discovery on the issue of access, there

23   are also a number of discovery disputes with Defendants that I also believe must be resolved in

24   order to present facts necessary to oppose the Motion, including but not limited to the following:

25             (a)  For example, Defendants produced over 400,000 of pages of emails and

26   documents covering the 4-year span from 2001 until the game's commercial release in 2005,

27   that the game was being developed.  However, there appears to be a critical gap in the

28   evidentiary record reflecting the evolution of the story itself from late 2002 until approximately

1   February or March 2003, where the story documentation seems to suddenly start again but with

2   dramatically new direction and specific expression similar to the claimed infringing elements.

3              (b) I deposed Sony's PMK regarding its search for and production of documents,

4   and that deposition raised numerous issues regarding Sony's search for and production of

5   documents, including the fact that an entire database of responsive documents was apparently

6   wiped clean. Sony produced its Associate General Counsel, Jennifer Liu, who is actively

7   involved in managing this case and Sony's outside litigation counsel. Liu was unprepared to

8   testify fully and accurately on several areas for which she was designated. For example, she

9   unable to answer many questions as to the nature of the search and production of documents

10  responsive to Plaintiffs' RFPs. She was unable to confirm or deny, and in many cases, seemed

11  to be guessing as to whether: the V: and Z: drives and intranet had been searched (Liu

12  Deposition ("Liu Depo"), pp. 110:23-111:8, 112:1-112:3, and 121:23-122:4); how the search

13  was conducted (Liu Depo, p. 112:5-112:16); how the documents were produced (i.e. in the

14  ordinary course of business or by search term) (Liu Depo, pp. 112:20-115:1); how Whitney

15  Wade conducted a search for hard copy documents (Liu Depo, pp. 101:15-102:4); whether

16  Jaffe's computers were searched (Liu Depo, pp. 93:18-94:7); why certain DVDs were not

17  produced until two weeks before the close of discovery (Liu Depo, p. 109:18-109:21); whether

18  Sony was still searching for responsive documents (Liu Depo, p. 123:17-123:24); and why Sony

19  produced 45,000 pages of documents on April 6, 2009, just 36 hours before the key depositions

20  were schedule to start (Liu Depo, p. 134:12-134:22). Attached hereto as **Exhibit 7** are true and

21  correct excerpts of the transcript of the deposition of Jennifer Liu taken on April 17, 2009.

22              (c) During the deposition, Ms. Liu promised to go check on documents likely to

23  be stored on their V: and Z: drives. Only after the deposition concluded was I told by opposing

24  counsel that Sony had cleared that drive – *i.e.*, destroyed those documents – to make room for

25  another game project. A true and correct copy of an email thread with Ms. Oliver on this

26  subject is attached hereto as **Exhibit 8**. This raised numerous questions, when those documents

27  were deleted, or why, and why Sony did not store those documents on a back-up disk as it

28  traditionally had done in the past when it cleared other drives. *See, e.g.*, April 3, 2002 email, a

1   true and correct copy of which is attached hereto as **Exhibit 9**, showing that Sony previously

2   archived documents and drives when making room for new internal projects.

3         (d)  At her deposition, Ms. Liu testified that Sony searched for responsive

4   documents by running approximately 70 search terms to identify documents responsive to

5   Plaintiffs' Requests for Production ("RFPs") (Liu Depo, pp. 105:11-105:22 and 106:7-106:11).

6   However, she was  unable to identify what specific search terms were used (or not used) in

7   trying to gather responsive documents.   She represented Sony would produce a list of search

8   terms. *Ibid*. No list has been provided. The fact that Sony used specific search terms to gather

9   documents also seems to explain why the 400,000 pages were produced in no particular order

10  but appeared to us to have been shuffled, which has made trying to re-trace how game actually

11  came together extremely difficult.

12        (e)  At her deposition, Ms. Liu testified that Sony had not and would not produce

13  documents in response to Plaintiffs' RFPs 6 and 7, which sought financial documents

14  evidencing its development expenditures for GOW and any royalty payments made to entities

15  and/or persons involved in the project, claiming that such records were beyond the scope of

16  discovery. (Liu Depo, pp.128:23-130:14).  Evidence of expenditures and milestones and who

17  was paid for their contributions to this game goes directly to Plaintiffs' claims on liability to see

18  how the story developed, when and by whom.

19        (f)  As noted above, Sony produced 45,000 pages from 26 different

20  witnesses/custodians and 5.5 hrs DVD of GOW game play-through months late, on April 6,

21  2009, long after the documents should have been produced and just **36 hours before I was**

22  **leaving to fly to San Diego and then Los Angeles to conduct my 5 critical depositions in the**

23  **case.**  Indeed, I deliberately scheduled the depositions near the close of discovery so that we had

24  as much time as possible to review and analyze the 360,000 Sony previously produced.  We had

25  no opportunity to review those documents prior to deposing the key witnesses.  Moreover, like

26  the other 363,000 pages previously produced by Sony, these were neither produced as kept in

27  the ordinary course of business, or by RFP category.  Rather, they were also randomly shuffled

28  by unknown search terms within each custodian, making it unreasonably difficult and

– 13 –

1   burdensome to piece together how GOW came together.  After completing our five depositions,

2   we learned that there were in fact critical documents within those 45,000 pages that we did not

3   get to use during the depositions, including, *e.g.,* e-mail between Mark Caplan of Sony Pictures

4   Entertainment ("SPE") and Shuhei Yoshida of SCEA dated 9/24/01 regarding working SPE

5   with SCEA on upcoming film or TV licenses (SCEA 365041); e-mails between SPE and SCEA

6   in 2001 regarding potential projects (SCEA 364459-63, 365496-97, 365499, 366416-17); e-mail

7   regarding various story ideas still being developed in May 2002 (SCEA 364485-364494); e-mail

8   from one of the early writers contracted to work on GOW regarding answers to questions posed

9   by Jaffe (SCEA 364501);

10        (g)  Similarly, Sony refused to produce its Privilege Log until 7:30 p.m. the day

11   discovery closed, hours <u>after</u> I had just concluded the Ms. Liu's deposition, once again

12   depriving me of any opportunity to question its designated witness about documents listed on

13   that log, including numerous documents that reflect Sony's IP clearance and copyright issues in

14   particular.  A true and correct copy of Sony's privilege log and email to which it was attached,

15   is attached hereto as **Exhibit 10**.

16      I declare under penalty of perjury under the laws of California and the United States of

17   America that the foregoing is true and correct and that this Declaration is executed on this 28th

18   day of October, 2009, at San Francisco, California.

19

20            By: _____

21              MICAH R. JACOBS

22              *****

23   12095431.1

24

25

26

27

28

DECLARATION OF MICAH R. JACOBS IN SUPPORT OF REQUEST FOR
DENIAL OR CONTINUANCE OF SUMMARY JUDGMENT UNDER FRCP RULE 56(F)