United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JONATHAN BISSOON-DATH and
JENNIFER B. DATH a.k.a. JENNIFER
BARRETTE-HERZOG,

          Plaintiffs,

    v.

SONY COMPUTER ENTERTAINMENT
AMERICA, INC., DAVID JAFFE, and DOES
1 THROUGH 100, inclusive,

          Defendants.

_____/

No. C 08-1235 MHP

**MEMORANDUM & ORDER**

**Re: Defendants' Motion for Summary
Judgment**

      In this action, Jonathan Bissoon-Dath ("Bissoon-Dath") and Jennifer B. Dath[1] ("Dath")
(collectively "plaintiffs") allege that Sony Computer Entertainment America, Inc. ("Sony") and its
former employee David Jaffe (collectively "defendants") misappropriated plaintiffs' original
copyrighted works to develop the popular *God of War* video game. Defendants now move for
summary judgment. Having considered the parties' arguments and extensive submissions, the court
enters the following memorandum and order.

BACKGROUND
I.     Parties

      Plaintiffs Bissoon-Dath and Dath are individuals living in Davis, California. Docket No. 97
(Joint Statement of Undisputed Facts or "JSUF") at 2. At some or all times relevant to this action,

Dath acted as an agent for Bissoon-Dath.  Docket No. 84 (Bissoon-Dath Dec.) ¶¶ 22-24.  Defendant Sony is a corporation headquartered in Foster City, California, which distributes PlayStation 2 and PlayStation Portable ("PSP") video game consoles and related games.  JSUF at 2; Docket No. 1 (Complaint) ¶¶ 6-8.  Defendant Jaffe was at all times relevant to this action an employee of Sony. He was the lead designer of the *God of War* video game, which Sony commercially launched in March 2005.[2]  Docket No. 35 (Jaffe Dec.) ¶¶ 3-4; Docket No. 33 (Becker Dec.) ¶ 5.

II.      Plaintiffs' Works

        Plaintiffs allege defendants infringed their copyrights to one or more of five specific works. These include two treatments, "Theseus: A Screenplay Treatment" ("Theseus") and "The Adventures of Owen" ("Owen"), and two screenplays, "Olympiad Version A" ("Olympiad A") and "Olympiad" ("Olympiad").  Bissoon-Dath Dec. ¶ 10.  "Owen" included an original illustrated map of the "Island at the Edge of the Living World" ("the map"), which was created by Dath with input from Bissoon-Dath in February or March 2002.  *Id.* ¶ 21; Docket No. 85 (Dath Dec.) ¶ 21.  The five works, including the map, are collectively referred to herein as "plaintiffs' works."  Plaintiffs began distributing the works in January or February 2002.  Bissoon-Dath Dec. ¶¶ 20-22 & 24.

        With certain variations, each of plaintiffs' works tells a similar story.  The works open with a Spartan attack on Athens led by the Spartan co-king and/or general Gaylon and the Spartan colonel Balzak.  Docket No. 44 (Oliver Moving Dec.), Exh. D ("Owen") at 6; *id.*, Exh. E ("Theseus") at 5; *id.*, Exh. F ("Olympiad") at 4; *id.*, Exh. G ("Olympiad A") at 5.  It is later revealed that the Spartan kings are loyal to the god Ares.  *See* Olympiad at 50 (The Spartan solders "must only obey one cause . . . the honor and glory of following their kings in the service of Ares."); *id.* at 86 (The Spartan kings "get the soldiers to do whatever they want by brainwashing them into believing that the war god, Ares, is the one true god."); *see also* Olympiad A at 52; Owen at 7; Theseus at 23.  As the temporarily beaten Spartan army retreats from Athens, the gods gather and discuss the situation, with Zeus and Athena expressing distaste for the state of war in Greece.  Olympiad at 12-13; Olympiad A at 13; Owen at 7; Theseus at 9.  In order to restore peace, Zeus decides to order all Greece to declare a truce and participate in an Olympiad.  Olympiad at 13; Olympiad A at 14; Owen

2

at 7; Theseus at 9. When Ares and Apollo (and Hermes, in three of the works) object to the plan, the gods agree that Zeus will instead choose a mortal whose quest will be to convince Athens and Sparta to declare a truce. Olympiad at 14-15, 19; Olympiad A at 14-17; Owen at 7; Theseus at 9.

The champion is informed of the quest by a magical nymph before being sent to Athens and then sent forth by the Athenian Council to perform a series of tasks culminating in the truce and the Olympic Games. Olympiad at 19, 35; Olympiad A at 20-21, 37; Owen at 8, 9; Theseus at 10, 13. During his quest, the champion must capture the Nemean Lion, rescue a hostage from the Amazons, rescue a hostage held by Hades in the underworld (in "Owen" and "Theseus" only) and convince Sparta to participate in the truce. Olympiad at 36, 44, 50; Olympiad A at 38, 46, 52; Owen at 10, 12; Theseus at 13, 16, 19. A truce is eventually declared and the Olympic Games are held in Sparta. Olympiad at 57; Olympiad A at 59; Owen at 13; Theseus at 21. While the games are in progress, Sparta secretly attacks Athens. Olympiad at 81; Olympiad A at 83; Owen at 16; Theseus at 19-20. In the end, the protagonist is crowned the Olympic champion, the Spartan co-kings (or General and Dictator, in "Owen" and "Theseus") are removed from power, and the sneak attack on Athens is thwarted. Olympiad at 102, 104; Olympiad A at 104, 106; Owen at 19; Theseus at 41-43. In "Owen," Zeus orders the Spartans to adopt democracy and lift the siege of Athens. Owen at 19. In "Theseus," the Spartan royal guard champion, tired of the sacrifice of justice and freedom in service to Ares, first seizes the Spartan Dictator and then convinces the Spartan army to withdraw from Athens. Theseus at 42-43. In "Olympiad" and "Olympiad A," the stadium crowd overwhelms the Spartans and "an army of the united people of Greece" liberates Athens. Olympiad at 104; Olympiad A at 106. Peace and democracy then reign over Greece. *See* Olympiad at 104 ("Sparta, never again, threatened [sic] the rest of Greece, which enjoyed the longest period of peace and prosperity in its history, as city after city adopted the Athenian political system called . . . democracy.") (ellipsis in original); *see also* Olympiad A at 106; Owen at 20; Theseus at 43.

III.    Defendants' *God of War* Video Game

*God of War* is a multi-hour video game. JSUF at 3. Sony released *God of War* in March 2005. *Id.* The game is rated "M" for a "MATURE 17+" audience. *Id.* at 5.

3

United States District Court

For the Northern District of California

1    In the game, also set in ancient Greece, the warrior Kratos fights myriad human and mythical

2   opponents and ultimately replaces Ares as the god of war.  Oliver Moving Dec., Exh. W (Merged

3   Script) at 45.[3]  In a series of flashbacks, the player learns that Kratos was once a captain in the

4   Spartan military but rose to command an entire army.  *Id.* at 15.  With his army almost annihilated

5   and a barbarian king about to kill him, Kratos offered his life to Ares in exchange for the destruction

6   of his enemies.  *Id.* at 22-23.  Thereafter, Kratos led armies in conquest, serving Ares as "a beast, his

7   humanity robbed," until Ares tricked Kratos into killing and burning his own wife and child.  *Id.* at

8   29, 31.  Kratos then rejected Ares and began serving other gods, hoping they would relieve his

9   nightmares of his family's murder.  *Id.* at 4.  The action of *God of War* game-play begins with

10   Kratos awakening from a nightmare and imploring a statue of Athena to relieve his nightmares.  *Id.*

11   Speaking through the statue, Athena offers divine forgiveness to Kratos if he kills Ares.  *Id.*  The

12   game manual includes a gathering-of-the-gods scene that explains Athena's request:  Zeus, Athena

13   and Ares are gathered to discuss Kratos, and Athena complains that Ares is preparing forces to

14   attack Athens.  Jaffe Dec., Exh. E (Game Manual) at 3.  This scene does not appear in the game

15   itself.

16    Having accepted Athena's offer, Kratos travels to Athens and finds that Ares is attacking the

17   city with an army of mythical beasts including Minotaurs and Zombies.  *Id.* at 6-7.  The Oracle in

18   Athens tells Kratos he must find Pandora's Box, the only weapon capable of killing Ares.  *Id.* at 16.

19   At the edge of the Desert of Lost Souls, a statue of Athena informs Kratos that he must cross the

20   desert, following and then killing four Sirens to do so, and find a Titan crawling around the desert

21   with the Temple of Pandora chained to his back.  *Id.* at 17-18.  Liberally extinguishing his

22   adversaries with his "Blades of Chaos," Kratos quests to find Pandora's Box.  He locates it and is

23   dragging it out of the temple when Ares, still attacking Athens but aware of Kratos' achievement,

24   launches a column that impales Kratos.  *Id.* at 32-33.  Kratos dies and begins to fall to the

25   underworld, but he scrambles onto the stairway leading into Hades and crawls back to life through a

26   grave near Athens.  *Id.* at 35-36.  There he recovers Pandora's Box from Ares, opens the lid and

27   becomes a giant, and defeats Ares in battle.  *Id.* at 38, 42.  Later, Kratos attempts suicide by jumping

28

4

United States District Court

For the Northern District of California

1   off a cliff into the sea because the gods, despite forgiving him for murdering his family, did not

2   relieve his nightmares. *Id.* at 43-44. He is then lifted from the sea and directed up a flight of stairs

3   to assume the now-vacant throne of the god of war, from whence he oversees various modern wars,

4   including World War II and the Vietnam war. *Id.* at 44-45. Bonus scenes reveal that Kratos is

5   actually the son of Zeus and a mortal woman who moved to Sparta when driven out of her village,

6   that Kratos had a weaker brother who died when turned out by the Spartans, and that the ruins of

7   Pandora's Temple were discovered in modern times. *Id.* at 48-49, 50.

8   IV.    Procedural History

9          Plaintiffs initiated this action in February 2008. The parties stipulated to a number of

10  continuances to pursue alternative dispute resolution. The parties did not reach a settlement, and

11  defendants thereafter filed the instant motion for summary judgment.

12

13  LEGAL STANDARD

14         Summary judgment may be granted only when, drawing all inferences and resolving all

15  doubts in favor of the non-moving party, there are no genuine issues of material fact and the moving

16  party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see generally Anderson v.*

17  *Liberty Lobby, Inc.*, 477 U.S. 242, 247-255 (1986). A fact is "material" if it may affect the outcome

18  of the proceedings, and an issue of material fact is "genuine" if the evidence is such that a

19  reasonable jury could return a verdict for the non-moving party. *Id.* at 248. The court may not make

20  credibility determinations. *Id.* at 255. The moving party bears the burden of identifying those

21  portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of

22  material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its

23  initial burden, the non-moving party must go beyond the pleadings and, by its own affidavits or

24  discovery, set forth specific facts showing that there is a genuine issue for trial. Fed R. Civ. P. 56(e);

25  *see Anderson*, 477 U.S. at 250.

26         "Although summary judgment is not highly favored on questions of substantial similarity in

27  copyright cases, summary judgment is appropriate if the court can conclude, after viewing the

28

evidence and drawing inferences in a manner most favorable to the non-moving party, that no reasonable juror could find substantial similarity of ideas and expression." *Shaw v. Lindheim*, 919 F.2d 1353, 1355 (9th Cir. 1990) (quoting *Narell v. Freeman*, 872 F.2d 907, 909-10 (9th Cir. 1989)). "Where reasonable minds could differ on the issue of substantial similarity, however, summary judgment is improper." *Id.* (citations omitted). The Ninth Circuit "ha[s] frequently affirmed summary judgment in favor of copyright defendants on the issue of substantial similarity." *Funky Films, Inc. v. Time Warner Entm't Co., L.P.*, 462 F.3d 1072, 1077 (9th Cir. 2006) (citations omitted).

DISCUSSION

Plaintiffs have advanced claims for copyright infringement, contributory copyright infringement and unfair business practices in violation of section 17200 of the California Business and Professions Code. The allegations of copyright infringement form the basis for the latter two claims. Under the Copyright Act, as amended in 1976, "copyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression . . . from which they can be perceived, reproduced, or otherwise communicated . . . ." 17 U.S.C. § 102(a). To prevail on a claim of copyright infringement, a plaintiff must show that (1) he or she owns a valid copyright in the work in question and (2) that the defendant copied protected elements of that work. *Cavalier v. Random House*, 297 F.3d 815, 822 (9th Cir. 2002). Defendants do not dispute that plaintiffs' works are original works of authorship for purposes of the Copyright Act or that plaintiffs own a valid copyright in those works.

A plaintiff may establish copying either (1) by presenting direct evidence of copying or (2) by showing that the defendant had access to the work and that the works at issue are substantially similar. *Id.* Plaintiffs have not presented direct evidence of copying and so seek to establish copying with a showing of access and substantial similarity. Access may be established by showing that the defendant had a reasonable possibility to view the plaintiff's work. *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 482 (9th Cir. 2000). Such a possibility can arise either where there has

been wide dissemination of a plaintiff's work or where there is a particular chain of events linking the work to the defendant. *Id.* The evidence must rise beyond mere speculation or a bare possibility, but it may be proved circumstantially such as by showing a chain of events linking the plaintiff's work and the defendant's alleged access. *Id.* The Ninth Circuit applies an "inverse ratio rule," requiring a "lower standard of proof of substantial similarity when a high degree of access is shown." *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1178 (9th Cir. 2003). Absent evidence of access, a "striking similarity" between the works may give rise to a permissible inference of copying. *Baxter v. MCA, Inc.*, 812 F.2d 421, 423 (9th Cir. 1987) (citations omitted).

Substantial similarity is analyzed using a two-part test with "extrinsic" and "intrinsic" components. *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1442 (9th Cir. 1994). "[T]he extrinsic test . . . objectively considers whether there are substantial similarities in both ideas and expression." *Id.* The extrinsic test requires a comparison of specific, concrete elements, focusing on "articulable similarities between the plot, themes, dialogue, mood, settings, pace, characters, and sequence of events." *Funky Films*, 462 F.3d at 1077 (quoting *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994)). Analytic dissection of a work and expert testimony are appropriate to the extrinsic test. *Smith v. Jackson*, 84 F.3d 1213, 1218 (9th Cir. 1996). The intrinsic prong "test[s] for similarity of expression from the standpoint of the ordinary reasonable observer, with no expert assistance." *Funky Films*, 462 F.3d at 1077. On summary judgment, only the extrinsic test is relevant: if the plaintiff satisfies the extrinsic test, the intrinsic test's subjective inquiry must be left to the jury and summary judgment must be denied. *Smith v. Jackson*, 84 F.3d at 1218; *Kouf*, 16 F.3d at 1045.

"Because only those elements of a work that are protectable and used without the author's permission can be compared when it comes to the ultimate question of illicit copying, [the court] use[s] analytic dissection to determine the scope of copyright protection before works are considered 'as a whole.'" *Apple Computer*, 35 F.3d at 1443. Copyright law protects a writer's expression of ideas, but not the ideas themselves. *Kouf*, 16 F.3d at 1045. "General plot ideas are not protected by copyright law; they remain forever the common property of artistic mankind." *Berkic v. Crichton*,

7

United States District Court

For the Northern District of California

761 F.2d 1289, 1293 (9th Cir. 1985).  Nor does copyright law protect "scenes a faire," scenes that flow naturally from unprotectable basic plot premises.  *Id.*; *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983).  "[P]rotectable expression includes the specific details of an author's rendering of ideas, or 'the actual concrete elements that make up the total sequence of events and the relationships between the major characters.'"  *Metcalf v. Bochco*, 294 F.3d 1069, 1074 (9th Cir. 2002) (quoting *Berkic*, 761 F.2d at 1293).  "However, the presence of so many generic similarities and the common patterns in which they arise [can help to] satisfy the extrinsic test.  The particular sequence in which an author strings a significant number of unprotectable elements can itself be a protectable element."  *Id.*

The parties have briefed both the issues of access and substantial similarity.  The court concludes below that no reasonable juror could find substantial similarity of ideas and expression, even if access to all of plaintiffs' works were proven.  Accordingly, the court does not reach the question of access.

I.    Preliminary Matters

Plaintiffs have filed a motion under Federal Rule of Civil Procedure 56(f) for denial or continuance of the motion for summary judgment pending further discovery.  At an August 25, 2008, case management conference, the court limited the parties to five depositions per side.  Docket No. 17 (minute order).  Plaintiffs now assert that they require additional depositions before proceeding with the motion.  Notably, the requested additional depositions each pertain to the question of access.  Even if access could be proved, plaintiffs' copyright infringement claim can be readily adjudicated based on the lack of substantial similarity; accordingly, it would waste the litigants' resources to allow further discovery relating to the access prong.  The Rule 56(f) motion is DENIED.

Plaintiffs have also filed several objections to evidence presented by defendants.  Plaintiffs object to the declaration of David Jaffe on several grounds.  To the extent Jaffe opines about the contents of Edith Hamilton's *Mythology: Timeless Tales of Gods and Heroes*, excerpts of which are appended to the declaration, plaintiffs' motion is GRANTED pursuant to Federal Rule of Evidence

8

United States District Court

For the Northern District of California

1  1002 (the "best evidence" rule), and the court strikes Jaffe's testimony.  The court DENIES

2  plaintiffs' motion to strike the Hamilton excerpts themselves, as they are admissible as a learned

3  treatise.  *See* Fed. R. Evid. 803(18).[4]  Plaintiffs also ask the court to strike certain statements by Jaffe

4  on the basis that he is improperly offering an expert opinion.  For example, Jaffe stated, "I am

5  familiar with many stock and common cinematic uses of deserts, valleys, chasms, and hell and the

6  Underworld in *Edith Hamilton*, *Wonder Woman*, *Dante's Inferno*, *Indiana Jones and the Temple of*

7  *Doom*, and *Clash of the Titans*."  According to plaintiff, Jaffe is here relying on "his specialized

8  knowledge of popular culture references," a concept that is probably oxymoronic.  The notion that a

9  witness must submit an expert report before being allowed to opine that Dante wrote about hell

10  strikes the court as rather silly.  However, because the court does not in any event rely on Jaffe's

11  characterizations, the motion to strike these characterizations is GRANTED.  The remaining

12  challenged portions of the Jaffe declaration are not relied upon by the court.

13      Plaintiffs' motion to strike two paragraphs from the declaration of Allan Becker is

14  GRANTED because his statements rely upon hearsay statements.  The motion to strike paragraph 19

15  of the Oliver declaration is DENIED, and the motion to strike paragraphs 40 through 59 of that

16  declaration is GRANTED.  The motion to strike paragraph 7 of the Stein declaration, paragraph 10

17  of the Fay declaration and paragraph 10 of the Krawczyk declaration is DENIED; however, the court

18  does not rely upon these statements.

19      Plaintiffs also challenge the declaration of defendants' expert Dr. Richard P. Martin on the

20  grounds that his opinions are based on an incorrect legal standard which might have improperly

21  "colored" his methodology.  In fact, Martin does not discuss the legal standard for copyright

22  infringement at all.  He notes that his analysis applies "the Comparative Method" and clearly

23  explains how it differs from the "Source Analysis" method used by plaintiffs' expert, Dr. Anthony

24  W. Bulloch.  To the extent the court has considered Martin's testimony, it has done so for his

25  knowledge of particular myths and their elements, not to answer the ultimate legal questions at issue.

26  Accordingly, plaintiff's motion is DENIED.

27

28

Finally, plaintiffs make two objections to the materials filed with defendants' reply brief. Firstly, plaintiffs object that defendants filed declarations from seven new witnesses—Larry Shapiro, Ken Sherman, Michael Shane, Judith Karfiol, Susan Deardoff and two document custodians, presumably Jenna Gambaro and Robin Weitz—for the first time with their reply. Each of these declarations pertains to access, not substantial similarity, so the court declines to take up the objection. Secondly, plaintiffs argue that exhibits EE and FF to the Oliver reply declaration, comprising charts showing purported inaccuracies in plaintiffs' opposition brief and accompanying declarations, amount to twenty-nine pages of briefing beyond the limit imposed by Civil Local Rules 7-3 and 7-4. Plaintiffs are correct. These charts were produced by defendants' attorneys for the purposes of argument; they are briefing, not evidence. Accordingly, the court disregards those exhibits.[5]

II.    Copyright Infringement: Substantial Similarity

Plaintiffs contend that *God of War* is substantially similar to their works. On a motion for summary judgment in a copyright infringement action, the "extrinsic test" is applied. This test examines "articulable similarities between the plot, themes, dialogue, mood, settings, pace, characters, and sequence of events."[6] *Funky Films*, 462 F.3d at 1077; *Smith v. Jackson*, 84 F.3d at 1218. Non-protectable elements are filtered out and disregarded.[7] *Funky Films*, 462 F.3d at 1077 (citing *Cavalier*, 297 F.3d at 822).

A.    Plot

Plaintiffs' works and *God of War* both involve a mortal human questing at the behest of a Greek god. In plaintiffs' works, Zeus initiates a quest to restore peace after a human Spartan army attacks Athens, by convincing Athens and Sparta to participate in Olympic Games. *See, e.g.,* Olympiad at 4-19. In *God of War*, the goddess Athena assigns a quest to kill the god Ares while Ares is attacking Athens with mythical beasts. Merged Script at 4-7. A scene in which the gods gather together for discussion is provided as a background for the assignment in both stories.[8] Early in "Olympiad," eleven gods are gathered around a pool of water on whose surface the Spartan army is seen after its attack on Athens, and Zeus expresses his displeasure at the state of war in the mortal

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

world.  Olympiad at 12-13.  Zeus ultimately decides to order all of Greece to participate in the

Olympic Games as a means to achieve peace, choosing the mortal Owen to convince Athens and

Sparta to declare a truce for the games.  *Id.* at 13, 19.  In "Owen," this decision is made after the

gods "argue back and forth" about Zeus's intervention in mortal affairs.  Owen at 7.  In "Theseus,"

Ares "threatens to start a war among the gods" unless Zeus agrees to the mortal champion scheme.

Theseus at 9.  In "Olympiad," Ares and Apollo morph into giant cobras and physically fight Athena

and Zeus until Zeus agrees to choose a mortal champion.  Olympiad at 14-15.  In "Olympiad A,"

Ares, Apollo, and Hermes threaten to remove Zeus by force but Hestia intervenes and averts this

outcome by suggesting the selection of a mortal champion.  Olympiad A at 15-17.  The *God of War*

gathering-of-the-gods scene, which occurs only in the game manual and not the game itself, is quite

different.  Only Zeus, Athena and Ares are present to discuss the "mortal" Kratos, who appears

alone in a pool of water[9] resembling a well; the gods discuss Kratos's strength and Ares's impending

attack on Athens, but they make no mention of choosing mortals for any purpose.  Game Manual

at 3.  There is no physical battle among any of the gods in the *God of War* scene nor any threat of

overthrowing Zeus; the only argument is a brief "quibble" between Ares and Athena which  pertains

to Ares's impending attack on Athens, not the selection of any mortal champion.  *See id.*  Athena

appears to Kratos only later and asks him to kill Ares in return for forgiveness.  Merged Script at 4-

5.

In both works, the protagonists must accomplish various tasks to achieve their goals: the

participation of Athens and Sparta in the Olympic Games in plaintiffs' works, and the death of Ares

in *God of War*.  In "Olympiad," the Athenian Council, as a condition of the city's participation in the

Games, requires that the protagonist capture the Nemean lion, retrieve a hostage from the Amazons,

and convince Sparta to agree to a truce.  Olympiad at 35, 44, 50.  In *God of War*, the protagonist is

not given specific tasks to perform; rather, he is told that Pandora's Box, hidden in the desert, is the

only weapon capable of killing Ares.  Merged Script at 16.  While seeking this weapon, Kratos must

cross the Desert of Lost Souls and navigate through Pandora's Temple.  Merged Script at 16-18.  All

of plaintiffs' works end with the protagonist winning the Olympics, Athens saved from destruction

United States District Court

For the Northern District of California

1   by the Spartans, and all of Greece experiencing lasting peace and prosperity.  Owen at 20; Theseus

2   at 43; Olympiad A at 106; Olympiad at 104.  In contrast, *God of War* ends with Athens destroyed

3   and Kratos killing Ares, becoming the new god of war, and overseeing a series of modern wars.

4   Merged Script at 45-46.

5          There is some similarity between the two stories.  As have stories since time immemorial,

6   both involve a questing hero acting in accord with a divine power or powers.  *See generally* Joseph

7   Campbell, *The Hero With A Thousand Faces* (2d ed. 1968).  Yet the motivations, tasks and

8   accomplishments of the respective questing heroes are quite different.  Both stories involve

9   antagonism between Athena, the goddess of wisdom, and Ares, the god of war, and between Athens

10  and Sparta.  The latter antagonism is surely not protectable, as the historical Athens and Sparta

11  famously fought the Peloponnesian War.  More generally, as plaintiffs note, popular culture

12  iterations of classical Greek mythology such as *Thor* and *Wonder Woman*, as well as ancient stories

13  such as Hesiod's *Theogony*, contain plot lines involving various combinations of wars and rivalries

14  among the Greek gods.  *See* Docket No. 47-1 (Martin Report) at 26-27.  Once the unprotectable

15  elements are filtered, the two stories' plots are similar only at a level of abstraction that is barely

16  meaningful, if at all.

17         B.     Themes

18         Plaintiffs contend that their works and *God of War* share the themes of "heroic savior, the

19  dark side of religious fanaticism, of a seemingly impossible quest, the avoidance of conflict and the

20  triumph over evil."  Pl.'s Opp. at 21.  In reality, the themes of plaintiffs' works are peace, democracy

21  and the establishment of the same.  All of the works begin with Zeus desiring peace in the mortal

22  world, proceed with the protagonist striving to create conditions for peace while the Spartans

23  scheme with Ares to perpetuate war, and end with peace and democracy spreading over Greece.

24  Owen at 20 ("Coexisting peacefully as sister democracies, Sparta and Athens both flourished

25  economically and socially as never before."); Theseus at 43 ("Coexisting peacefully as sister

26  democracies Sparta and Athens both flourished as never before."); Olympiad at 104 ("Greece . . .

27

28

12

1   enjoyed . . . peace and prosperity . . . as city after city adopted the Athenian political system called . .

2   . democracy."); Olympiad A at 106 (same).

3        The primary themes in *God of War* are violence, the search for divine forgiveness and the

4   continuation of war.  Violence pervades the game, the ultimate goal of which is to kill Ares.  *See*

5   Merged Script at 2 ("An arrow slams into the Fisherman's head, shattering his skull."); *id.* at 3

6   ("Slaughtered like animals, the victims lay before him."); *id.* at 4 ("A rapid succession of violent

7   images."); *id.* at 6 ("The axe lops off the second Redshirt's head."); *id.* at 18 ("Kratos . . . must

8   destroy all four Sirens."); *id.* at 22 ("A Spartan is decapitated."); *id.* at 24 ("Kratos pulls the lever,

9   igniting the burners and setting the Redshirt on fire, who screams as his cage is lowered to the

10  ground."); *id.* at 42 ("Kratos thrusts the sword upwards, ripping through Ares.").  While violence is

11  not absent from plaintiffs' works, it lacks the thematic centrality and intensity seen in *God of War*.

12  For instance, plaintiffs' protagonist refuses to kill such an "amazing animal" as the rampaging

13  Nemean Lion and instead transforms the beast into his "tamed pet."  Olympiad at 44.  Indeed,

14  outside of the generic battle scenes in which the Spartan army attacks Athens, very few deaths occur

15  in plaintiffs' works; instead, most fights end with the antagonists merely unconscious.  *See, e.g.*,

16  Olympiad at 27-28 (Spartan soldiers knocked unconscious), 47 (Amazon knocked unconscious).

17       Kratos's motivation for accepting the quest to kill Ares is divine forgiveness for murdering

18  his family.  Merged Script at 4-5.  To the extent that the motivations of plaintiffs' protagonist are

19  revealed, they appear to be the desire to abide by Zeus's wishes and to prove himself capable.  *See*

20  Olympiad at 22; Olympiad A at 24; Theseus at 6; Owen at 9.  Plaintiffs attempt to equate Kratos's

21  desire to end the nightmares of his family's murder at his own hands with the self-doubt of

22  plaintiffs' protagonist, engendered either by his failure at age eight to protect his family from

23  bandits, *see* Theseus at 23-24, or by his parents' ridicule, *see* Owen at 16.  This attempt is

24  unpersuasive: the self-doubt of plaintiffs' protagonist has no discernable similarity to Kratos's

25  suicidal anguish, wrenching guilt and murderous violence.  This is in keeping with the fact that

26  plaintiffs' works culminate in an era of peace and prosperity, while *God of War* ends with a new god

27

28

13

of war overseeing wars throughout the ages.  Merged Script at 45.  Moreover, democracy plays

absolutely no thematic role in *God of War*.  Thematically, the two stories are quite different.

    C.    <u>Dialogue</u>

        1.    <u>A Cruel, Brutish Spartan Commander</u>

    Plaintiffs attempt to illustrate similarities in dialogue by comparing Kratos, a former Spartan

commander, with a Spartan commander found in plaintiffs' works, alleging that both demonstrate

their cruelty by killing a "terrified" Spartan innocent who is "dragged" to his death, despite

"protests" against the "barbarism" of the act.  *See* Bissoon-Dath Dec., Exh. 4 (comparison charts) at

4-5.  Yet only one word quoted by plaintiff (or rather a form of it)—"barbarian"—appears on the

cited pages of the Merged Script.  *Compare id. with* Merged Script at 24-25.  Additionally, plaintiffs

are not comparing dialogue but rather scene descriptions.  Plaintiffs also note that the respective

Spartan commanders both act "in the name of" or "in the service of" Ares at some point.  Such

phrases are ordinarily used to express loyalty to a divinity and are not, standing alone, protectable by

copyright.  Plaintiffs also compare the statement in "Olympiad A" that the Spartan commander's

"thirst for war knew no bounds" with the statement that Kratos's "desire for conquest knew no

bounds."  This is misleading in that the quote from "Olympiad A" is referring to the "Spartans"

generally, not a Spartan commander.  *See* Olympiad A at 52.  The phrase "knew no bounds" is also

ordinary and clichéd.

        2.    <u>Gathering of the Gods</u>

    Plaintiffs also endeavor to point out similarities in the stories' respective gathering-of-the-

gods scenes.  Indeed, plaintiffs' counsel represented at oral argument that these scenes "read

verbatim."  They do not.  For example, plaintiffs assert that the dialogue in both scenes begins with

Zeus expressing concern about the impending destruction of Athens.  *See* Pl.'s Opp. at 20.  In fact,

Zeus expresses no concern about Athens in any of the works at issue.  In *God of War*, Zeus says he

has gathered the gods to discuss a "mortal whose actions I sense could have grave implications to all

of us here on Mount Olympus."  Game Manual at 3.  As discussed below in the analysis of the

characters, Zeus expresses absolutely no concern for Athens in this scene.  In "Olympiad" and

14

"Olympiad A," Zeus is concerned about the "sorry state" of Greece, the "whole of Greece" and "peace in the mortal world," not Athens specifically.  *See* Olympiad at 13; Olympiad A at 13-14.[10]

Plaintiffs also assert that statements made by Zeus to Athena and Ares are similar in the two stories.  In "Olympiad" and "Olympiad A," Zeus says, "Stop it . . . right now . . . the two of you.  There has been more than enough argument between mortals . . . and among us Gods."  Olympiad at 13, Olympiad A at 14.  In the *God of War* game manual, Zeus says, "Enough, both of you.  Your childish quibbles are your own, but I do not want this war encroaching on the steps of Mount Olympus."  Game Manual at 3.  While the first sentences of these statements are somewhat similar, the language is ordinary, clichéd and has likely been spoken by every mother of multiple children.  The second sentences are not substantially similar.  The first speaks to the unfortunate prevalence of contentious natures among both mortals and gods.  The latter speaks to the potential spread of a particular war against Athens.

Plaintiffs also point to dialogue in "Olympiad A" in which the goddess Hestia asks, "You would risk war on Olympus . . . from which many among us will surely meet a terrible end?"  Olympiad A at 16.  Plaintiffs assert that *God of War* includes a similar statement by Athena, namely "Civil war on Olympus would mean an end to us all."  In fact, this statement is nowhere to be found in *God of War*.  The statement appears in the story boards for "Dark Odyssey," an early prototype for *God of War*, but it was not included in the final work.  Docket No. 93 (Jacobs Opp. Dec.), Exh. 16 ("Dark Odyssey" story boards) at 10.  The fact that a strikingly similar excerpt of dialogue was used in an earlier version of an allegedly infringing work, but not the work itself, could be probative of a defendant's assertion that he did not have access to the plaintiff's work.  In this case, the words of the dialogue are dissimilar, and the notion of a war on earth leading to a war among the gods has been clichéd for a while—perhaps five thousand years or more.

Finally, plaintiffs compare Athena's remark in "Olympiad" and "Olympiad A" that "Owen is perfect to undertake this noble quest" to Zeus's remark in the *God of War* game manual that "Athena has chosen well, no doubt.  Perhaps Athens will survive after all."  *Compare* Olympiad at 20 *and* Olympiad A at 22 *with* Game Manual at 12.  This dialogue is simply not similar.

United States District Court

For the Northern District of California

3.    The Quest

During his quest, plaintiffs' protagonist tells the leader of the Athenian Council that he must "make [the Council] listen. All of Greece depends on it." Olympiad at 33; Olympiad A at 35. In *God of War*, the Oracle tells Kratos, "You must find me . . . Athens depends on it . . . ." Merged Script at 11. Any moviegoer can attest that the snippet of dialogue stating that something "depends on it" is clichéd. Moreover, the context of these statements is quite different. The first is spoken by plaintiffs' protagonist as he seeks to convince the Athenian Council that he truly is on a mission from Zeus, after the Council has laughed at his story. Olympiad at 33. The statement refers to all of Greece. The *God of War* statement refers only to Athens and is spoken by the Oracle to the protagonist as the Oracle is being carried away by Harpies. Merged Script at 11.

Later in the quest, plaintiffs' protagonist is warned: "through there many have entered . . . but none has returned." Olympiad at 40; Olympiad A at 42. "There" refers to the entrance to the Nemean Lion's cave. In *God of War*, Kratos is warned: "Many have gone in search of Pandora's Box. None have returned." Merged Script at 17. These statements refer to very different things (entering a cave versus searching for Pandora's Box), and the phrase "none has/have returned" is clichéd and unprotectable.

Plaintiffs' comparison of language regarding a javelin in plaintiffs' works and a column in *God of War* does not refer to dialogue and is thus irrelevant to the analysis of similarities in dialogue.

D.    Mood

The mood of plaintiffs' works is generally light-hearted, with elements of romance and comedy. While plaintiffs accurately point to some dark scenes, plaintiffs' characterization of both works as "extremely dark, violent, gloomy and filled with dread" is hyperbolic at best. *See* Pl.'s Opp. at 21. Plaintiffs describe some "lighter, even comic" scenes as being "sprinkled" throughout their works, but such terms more accurately describe the works as a whole with some darker scenes sprinkled in for contrast. *See*, *e.g.*, Olympiad at 15-16 (protagonist and side-kick chat about girls while drinking "brew, racing to finish."); *id.* at 30-31 (Owen runs into a merchant's stall while

16

staring at a beautiful girl; "Mercante notices the attraction between Aria and Owen.  It amuses and pleases him. . . . [Meanwhile,] corpulent Medea comes up behind Camden and pinches his butt."); Owen at 19 ("The entertaining pole vault competition proceeds with drama, comedy, and mishap.").

In contrast, the mood of *God of War* is dark and extremely violent.  There are virtually no light-hearted or comic moments in the game.  Indeed, the game begins with Kratos attempting suicide, repeatedly references Kratos's memories of and guilt over his past violent deeds, and ends with images of World War II and Vietnam.  Merged Script at 1, 4, 45.

At oral argument, plaintiffs' counsel represented that the Olympic Games are depicted as extremely violent events in plaintiffs' works.  Plaintiffs' counsel noted, for example, that the chariot race includes an intentional collision and that the javelin throw is aimed at a captive Spartan.  *See, e.g.*, Olympiad at 80, 90.  Such elements are not surprising in an action-adventure script and serve to temporarily heighten the tension of the story.  However, they fall short of establishing a pervasive mood of dark violence throughout plaintiffs' works.  Furthermore, the protagonist, though injured in the chariot collision, is healthy enough to participate in the next day's event, *id.* at 88-89, and the protagonist and another competitor intentionally avoid hitting the captive Spartan with their javelins, *id.* at 92-95—not a decision one would expect from Kratos.

E.    Settings

Both stories are set in ancient and mythical Greece, including scenes in Athens and on Mount Olympus.  *God of War* and two of plaintiffs' works, "Owen" and "Theseus," also include scenes set in the Underworld.  Significant portions of plaintiffs' works—e.g., approximately half of "Olympiad"—are set in Sparta, which appears in *God of War* only in two short bonus scenes.  *Compare* Olympiad at 50-104 *with* Merged Script at 47-50.  Plaintiffs' works also include scenes in and near the protagonist's village, a Nemean Village and the island of the Amazons; these settings are absent from *God of War*.  *God of War* includes scenes set on bluffs overlooking the Aegean Sea, on a boat on the Aegean Sea and in the Desert of Lost Souls where Pandora's Temple is located; these settings are absent from plaintiffs' works.

17

United States District Court

For the Northern District of California

1    While the shared settings of Greece, Athens, Mount Olympus, Sparta, and the Underworld do

2    establish some similarity between the works at issue, these settings are generic and clichéd for

3    stories involving ancient Greece and Greek gods.  While the action in *God of War* is spread over

4    several locations, the bulk of the action appears to occur inside Pandora's Temple in the Desert of

5    Lost Souls, and in Athens.

6    Contrary to plaintiffs' assertion, the respective depictions of Mount Olympus are also

7    dissimilar.  In plaintiffs' works, a meeting hall of the gods is located on Mount Olympus.  *See*

8    Olympiad at 12.  In "Olympiad," eleven golden statues of the gods face a pool of water in the

9    meeting hall.  *Id.*  The "flesh and blood" gods "morph" out of these statues.  *Id.* at 12-13.  In

10    "Olympiad A," the pool is "enormous" and no statues are mentioned.[11]  Olympiad A at 13.  In *God*

11    *of War*, Mount Olympus is merely glimpsed at the top of the stairs Kratos must climb to take his

12    place as the new god of war.  Merged Script at 45.  In the *God of War* game manual, three human-

13    like gods stand in the open air beside a round, well-like structure.  Game Manual at 3.  A jagged

14    mountain range is visible over their shoulders and low columns stand close behind them.  *Id.*  Two

15    notable differences distinguish these two depictions of Mount Olympus: plaintiffs' setting is indoors

16    while *God of War*'s is outdoors; and plaintiffs' pool is large enough to be faced by eleven large

17    ("twice the size of a man") statues while *God of War*'s well-like structure is quite small.

18    Plaintiffs also note that their works contain a "Meadow of Lost Souls" while *God of War*

19    contains a "Desert of Lost Souls."  The meadow appears only in "Owen" and on the accompanying

20    map.  In "Owen," the protagonist and his party "proceed inland down a road, passing through

21    meadows that contain lost souls wandering aimlessly."  Owen at 12.  *God of War* features a Desert

22    of Lost Souls, through which the titan Chronos crawls with Pandora's Temple chained to his back.

23    Merged Script at 18.  The concept of characters encountering lost souls is hardly original to either

24    plaintiffs or defendants, and a meadow is not a desert.  It is notable that the meadow is referenced in

25    only one sentence of "Owen," whereas a significant portion of the action in *God of War* takes place

26    in the desert.[12]

27

28

18

United States District Court

For the Northern District of California

1    Plaintiffs also note that their works contain a "Bottomless Valley" and assert that *God of War*

2  allegedly contains a similar "Bottomless Chasm."  Like the Meadow of Lost Souls, the Bottomless

3  Valley appears only in "Owen" and the accompanying map, and it is referenced in only one

4  sentence.  In "Owen," "satyrs take their captives, up the Steps to the Underworld, past the

5  Bottomless Valley and Fiery Lake."  Owen at 12.  Plaintiffs assert that the "Bottomless Chasm" in

6  *God of War* appears just before Pandora's Temple.  The screen image provided by plaintiffs,

7  however, simply shows a rope bridge spanning a wide gap.  *See* Bissoon-Dath Dec., Exh. 6 at 2.

8  Although the bottom is not visible, there is no indication that the void is *bottomless*.[13]

9

10    F.    Pace

11    Plaintiffs' works are relatively fast-paced action-adventure epics in which high-tension

12  scenes are interspersed with scenes of levity.  For instance, scenes featuring the initial Spartan attack

13  on Athens and the argument among the gods are followed by a scene in which the protagonist and

14  his sidekick drink and joke about girls.  Olympiad at 4-16.  *God of War* is a video game, and its pace

15  is driven at least in part by the individual player.  The game is generally very past-paced with few if

16  any lulls in the action other than those caused by a novice player.  Such a fast pace is hardly

17  surprising in a violent video game and is not readily indicative of any copying of plaintiffs' works.

18  In addition, the storyline is pieced together through repeated and disordered flashbacks rather than

19  presented in a linear fashion as in plaintiffs' works.

20    G.    Characters

21    Notably, some of the characters that plaintiffs allege to be similar across the stories are Greek

22  gods like Ares, Zeus and Athena.  These are stock figures not only of many contemporary stories,

23  movies and video games, but also of the Western collective unconscious.  In such a case, it is

24  particularly important for the court to use its own "Blades of Chaos" to slice or filter out the

25  unprotectable elements.  Greek gods, dialogues among them about mortal affairs, rivalries among

26  the gods, and mythical beasts such as the Hydra or the Nemean Lion[14] are unprotectable elements; it

27

28

19

United States District Court

For the Northern District of California

1   is uncontroversial that they have been used widely in both ancient and modern artistic works, in the

2   naming of astronomical bodies and spacecraft, and in other fields.

3        In arguing their case, plaintiffs focus on purported similarities pertaining to the protagonist,

4   Ares, a "Spartan commander" and Zeus.[15]

5             1.    The Protagonist

6        The protagonist in plaintiffs' works is a sheepherder and athlete.  Olympiad at 19; Olympiad

7   A at 20-21; Owen at 8; Theseus at 9.  Though his attributes vary slightly among the works, he is

8   generally described as young and handsome.  In "Olympiad," he is described as "[a]thletic,

9   handsome, the kind of guy they model statues after."  Olympiad at 15.  Zeus describes him as

10  personifying the Olympic spirit, and as fair and compassionate.  Id. at 19.  Ares finds him "fully

11  incapable of cold calculation without regard for justice."  Id. at 20.  Plaintiffs' protagonist is

12  generally non-violent and kind, as illustrated by his refusal to the kill the Nemean Lion and tendency

13  to leave enemies merely unconscious rather than dead.  See id. at 28, 36, 47.  Plaintiffs' works hint at

14  a great secret in the protagonist's past, but the secret is never revealed in "Olympiad" or "Olympiad

15  A."  Olympiad at 20; Olympiad A at 22.  In "Owen" and "Theseus," the secret is that the protagonist

16  is plagued by self-doubt caused either by his failure at age eight to protect his family from bandits or

17  by his parents' ridicule.  Owen at 16; Theseus at 24-25.

18       The protagonist in God of War, Kratos, is strikingly different.  Kratos was formerly a

19  professional military officer—a Spartan captain who rose to lead entire armies.  Merged Script at 15.

20  Later, he led forces in conquest as desired by Ares.  Id. at 29.  After rejecting Ares, Kratos undertook

21  various tasks for the other gods.  Id. at 4.  Kratos is bald, muscular and covered in red tattoos and

22  pale ashes.  Jaffe Dec. ¶ 16; Jacobs Opp. Dec., Exh. 14 (Game Guide) at 3.  He also has large blades

23  chained to his forearms.  Id.  Kratos is disturbingly prone to violence and does not hesitate to kill.

24  See, e.g., Merged Script at 11 (Kratos kills a civilian impeding his way).  Kratos is a tragic figure

25  reviled by most individuals he encounters.  A trapped fisherman, for instance, "would rather die than

26  be 'saved' by" Kratos.  Merged Script at 2.  Plaintiffs claim that Kratos, like Theseus, harbors a

27  "dark secret involving the ruthless slaughter of his family."  See Pl.'s Opp. at 18.  This

28

United States District Court

For the Northern District of California

mischaracterizes Kratos's well-known personal history as a secret and erroneously asserts similarity between a grown warrior's personal slaughter of his wife and child and an eight-year-old's inability to protect his parents from murderous bandits. The only similarity is that the murder of family members is somehow involved in both stories, an element which is both clichéd and articulated at an unprotectable level of abstraction.

         2.    <u>Ares</u>

     Both plaintiffs' works and *God of War* feature the god Ares. In plaintiffs' works, Ares is depicted as a giant man who can morph into an equally giant cobra. Olympiad at 12, 14. Ares threatens to rebel against Zeus if he insists on forcing peace on the mortal world and orders the Spartan leaders, who worship him, to attack Athens while hosting the Olympic Games. Olympiad at 14, 50-51. After first arguing with Zeus and then speaking with the Spartan leaders, Ares does not appear again in "Olympiad," "Olympiad A" or "Theseus." At the end of "Owen," Ares briefly appears and attempts to impede Zeus as the latter descends to the Olympic stadium. Owen at 19. Afterwards, Ares quarrels with Zeus again, temporarily incapacitates him, and is ultimately imprisoned in a gilded cage for one hundred years. Owen at 20. Although Ares is important to the plot of plaintiffs' works, the Spartan leaders, not Ares, are the chief antagonists.

     In *God of War*, Ares is the antagonist whom Kratos must defeat. Ares is depicted wearing thick armor and with long red hair and beard. Game Guide at 153. The game manual reveals that Ares is intent on destroying Athens because it is a "festering pit filled with flabby aristocrats." Game Manual at 3. Other than having once accepted the Spartan Kratos's pledge to serve him, Ares has no affiliation with Sparta in *God of War*. Ares personally attacks Athens with an army of mythical beasts in *God of War*, in contrast to Ares merely telling his loyal Spartans to attack the city in plaintiffs' works. Merged Script at 6-7; Olympiad at 50-51.

     At oral argument, plaintiffs' counsel represented that both plaintiffs' works and *God of War* depict the Spartans as exclusively loyal to Ares and Ares as determined to destroy Athens. Plaintiffs' counsel further represented that such a scenario had never before been described. These assertions are less than accurate. In *God of War*, only one Spartan, Kratos, is depicted as being loyal

United States District Court

For the Northern District of California

1  to Ares and then for only a short time.  *See* Merged Script at 23.  After serving Ares in exchange for

2  saving his life, Kratos serves a number of different gods and claims Athena as his patron goddess.

3  *See id.* at 1; Game Manual at 3.  Nowhere in *God of War* are the Spartans, as a people, depicted as

4  being exclusively loyal to Ares, and even Kratos serves other gods throughout the game.

5          3.      The Spartan Commander

6        Plaintiffs also assert that both their works and *God of War* include "brutish" Spartan

7  commanders.  Yet plaintiffs compare their antagonist Spartan commander, Gaylon, with *God of*

8  *War*'s protagonist, Kratos.  Moreover, plaintiffs incorrectly suggest that Kratos is a Spartan

9  Commander throughout *God of War*.  In fact, Kratos was "[o]nce a captain in the Spartan army" but

10  in the contemporary *God of War* storyline is a sailor-for-hire to the gods.  Merged Script at 4, 15.

11  Furthermore, it is hardly original to describe either a scheming general bent on war or the main

12  character of a violent video game as "brutish."

13          4.      Zeus

14        Plaintiffs claim that both stories depict Zeus as "being gravely concerned about the

15  impending destruction of Athens in a second attack by an army in service to Ares and as seeking to

16  intervene in the conflict to save Athens."  Pl.'s Opp. at 19.  Plaintiffs further claim that, like *God of*

17  *War*, their works all depict Zeus as worried about the negative consequences for Olympus of a war

18  among the gods, requiring the selection of a mortal champion.  *Id.*  While these statements

19  accurately describe plaintiffs' works, they fail to accurately describe *God of War*.  Firstly, when the

20  gods gather in the *God of War* game manual, Athens has yet to be attacked: Ares is merely

21  "marshalling his forces."  Game Manual at 3.  Secondly, Zeus expresses absolutely no concern for

22  Athens in that scene; he has "other worries," namely that Kratos "may grow too strong for his own

23  good.  And for ours."  *Id.*  In *God of War*, it is Athena, the patron goddess of Athens, who intervenes

24  to save the city, not Zeus.  Merged Script at 4-5.  When Ares and Athena exchange sharp words over

25  Ares's impending attack on Athens, Zeus shushes the pair and says he does not want Ares's war on

26  Athens "encroaching on the steps of Mount Olympus."  Game Manual at 3.  There is no further

27

28

                                    22

discussion by Zeus in *God of War* about any negative consequences to Olympus.  Thirdly, nowhere in *God of War* does Zeus choose a mortal champion.

H.   Sequence of Events

There are also significant differences in the respective sequences of events in plaintiffs' works and *God of War*.  Plaintiffs' works are all told in a linear, narrative fashion with scenes occurring one after another in logical sequence.  The story in *God of War*, in contrast, jumps around repeatedly and is told largely through flashbacks.  For instance, *God of War* opens with what will ultimately be the second-to-last scene; in this scene, Kratos jumps off a cliff.  Before Kratos reaches the rocks below (and presumably his death), the story jumps three weeks into the past to depict Kratos battling a Hydra at Poseidon's behest.  Merged Script at 1-2.

Plaintiffs' works begin with the Spartans attacking Athens, then retreating for the winter when repulsed by the city's forces.  Olympiad at 4-12.  The retreating army is visible in a pool of water on Mount Olympus.  *Id.* at 12.  The Spartan army returns the next year and attacks Athens while the Olympic Games are in progress in Sparta, but Athens is not conquered.  *Id.* at 81, 104.  According to the *God of War* game manual, Ares (not the Spartans) is preparing his forces to attack Athens (not retreating) when the gods meet to discuss Kratos.  Game Manual at 3.  Once the storyline begins in *God of War*, Ares is actively attacking Athens; he continues to do so for most of the game and has completed his conquest of the city when Kratos arrives to defeat him.  Merged Script at 4, 32, 37.

Plaintiffs assert that in both stories "Athens is saved from destruction by a Spartan commander who was once loyal exclusively to Ares but renounces Ares in a climatic [sic] one-on-one battle." Pl.'s Opp. at 23.  This assertion is misleading in several ways.  Firstly, Athens is not saved by *anyone* in *God of War*; the city is conquered and "lies in ruins" before Kratos fights Ares.  Merged Script at 37.  Secondly, Kratos is not a Spartan commander when he fights Ares.  *Id.* at 4, 15.  Thirdly, Kratos does not renounce Ares in one-on-one battle; although he rejected Ares in the past, the rejection occurred ten years before *God of War*'s action and involved no personal combat with the god.  *Id.* at 1, 31.  Fourthly, in "Theseus," the only one of plaintiffs' works in which a

23

United States District Court

For the Northern District of California

Spartan leader betrays Ares to rescue Athens, no character is referred to as a Spartan "commander." While the work features a Spartan General and a Spartan Dictator, it is the previously silent Royal Guard Captain who decides that justice and freedom have too long been sacrificed in Ares's name, orders the guard to seize the Dictator, and later defeats the Spartan Colonel in one-on-one combat at Athens. Theseus at 6, 23-24, 42-43. Fifthly, the Royal Guard Captain speaks of the Dictator's affinity for Ares, but reveals no exclusive loyalty of his own to the god. *Id.* at 42. Sixthly, the adjective "clima[c]tic" is belied by the fact that the one-on-one battle with the Colonel is referenced only in the epilogue. *Id.* at 43.

Plaintiffs' other contentions regarding the stories' respective sequences of events are no more availing. To the extent that plaintiffs accurately portray similarities, those similarities refer to clichéd and unprotected elements.

I.      Summary

An examination of articulable similarities between the plot, themes, dialogue, mood, settings, pace, characters and sequence of events of *God of War* and plaintiffs' works reveals far less similarity than would be required to overcome summary judgment, even if plaintiffs had proven access. Plaintiffs have pointed to no persuasive similarity in dialogue or narration that would suggest actual copying. As in *Berkic v. Crichton*, 761 F.2d at 293, there is some degree of similarity between the plots at an extremely generalized level. Yet, as that court admonished, "No one can own the basic idea for a story. General plot ideas are not protected by copyright law; they remain forever the common property of artistic mankind." *Id.* This is particularly true when virtually all of the elements comprising plaintiffs' works are stock elements that have been used in literary and artistic works for years, if not millennia. As noted, the particular sequence in which an author strings a significant number of unprotectable elements can itself be a protectable element. *Metcalf*, 294 F.3d at 1074. Here, the sequences of elements, and the relationships between them, are entirely dissimilar.[16] No reasonable trier of fact could conclude that *God of War* is substantially similar to any of plaintiffs' works.

III.    Other Claims

1    Plaintiffs' contributory infringement claim falls with its infringement claim.  As to the

2    section 17200 claim, plaintiffs assert that "additional discovery will reveal evidence of unfair and

3    unlawful business practices separate from and unrelated to infringement, and therefore, pursuant to

4    Rule 56(f), [plaintiffs] do not believe their section 17200 claim should be deemed preempted."  Pl.'s

5    Opp. at 24 n.9.  The complaint makes allegations pertaining only to copyright infringement.  Any

6    unfair business practice unrelated to infringement has not been pled and is purely hypothetical.

7    Accordingly, the section 17200 claim must be dismissed.

8

9    CONCLUSION

10    For the foregoing reasons, defendants' motion for summary judgment is GRANTED.

11    Judgment shall be entered accordingly.

12

13    IT IS SO ORDERED.

14

15    Dated: March 5, 2010

16    _____
MARILYN HALL PATEL

17    United States District Court Judge
Northern District of California

18

19

20

21

22

23

24

25

26

27

28

**ENDNOTES**

1.      Plaintiff Jennifer Barrette-Herzog avers that she changed her name to Jennifer B. Dath in 2008. Docket No. 85 ¶ 3.

2.      Along with defendant Jaffe, Marianne Krawczyk, Alexander Stein and Keith Fay have been credited with writing *God of War*.  Becker Dec. ¶ 7.

3.      The accused work is the *God of War* video game itself.  The "merged script" is a script for the video game containing all dialogue as well as background notes, and it has been extensively cited by both parties.

4.      There is no challenge to the authenticity of the Hamilton excerpts, and the court establishes the authority of the treatise by judicial notice.

5.      The court does not intend to disapprove generally of the use of charts in briefing where such use would be helpful and appropriate.  A well-designed chart can be extremely helpful in clarifying the relationships among complex issues, and attorneys should not be discouraged from including such.  The guidelines concerning lengths of briefs must be followed, however.

6.      Plaintiffs stated at oral argument that some dissimilarities between plaintiffs' works and *God of War* could arise merely because the latter is a video game rather than a movie script, even if the latter were copied from the former.  The characteristics of the respective media in which the works are embodied are noted below as appropriate.  The court finds that the differences in the media do not account for the marked dissimilarities between plaintiffs' works and *God of War*.

7.      At various points in the analysis below the court points out when similarities are general plot ideas or other elements not protected under the copyright laws.  Because the dissimilarity of plaintiffs' works to *God of War* is not a close question, it is unnecessary to set out an exhaustive filtering analysis.

8.      References to the two "stories" in this discussion denote comparisons between *God of War* and plaintiffs' works as a whole.

9.      Plaintiffs do not claim that looking through a pool of water is itself a protectable element.  *See* Docket No. 78 at 6:3-4.

10.      There is no dialogue in the "Theseus" and "Owen" treatments.

11.      Mount Olympus is not described in "Theseus" or "Owen."  *See* Theseus at 9; Owen at 9.

12.      Plaintiffs also allege defendants developed the map included in *God of War* by copying the map drawn by Dath.  This claim is wholly without merit.  There is precisely one element with any similarity: the "Meadow of Lost Souls"/"Desert of Lost Souls" element.  Defendants' expert Martin testifies that the story of sirens in a Desert of Lost Souls is derived from old Argonautic tales as re-packaged by Apollonius of Rhodes in the third century B.C.  *See* Docket No. 47-1 (Martin Report).  Plaintiffs' expert Bulloch does not contradict this testimony in his point-by-point reply to the Martin Report.  *See* Docket No. 76 (Bulloch Dec.).  Aside from that element, there is literally nothing else substantially similar about the maps other than the use of trees and mountains.  The Dath map is of an island; the *God of War* map is not.  Prominent in the Dath map are large rivers; the *God of War* map has none.  The features noted on the Dath map are a "Tunnel to the Underworld," a "Fiery Lake," "Poppy Fields," "Blackened Cliffs," a "3 Headed Dog," a "Bottomless Valley," and "Bent Tree Port."  The *God of War* map has none of these features.  The *God of War* includes several real and fictional locations, e.g., Athens, the Aegean Sea, Olympus, and "Zeus Moutain," none of which appear on the Dath map.

26

United States District Court

For the Northern District of California

13.     Defendant Jaffe testified that the bridge in *God of War* spans a crevasse in the back of the Titan on whose back the temple is chained.  Jaffe Dec. ¶ 22; *see* Merged Script at 18.

14.     The first labor of Heracles was to slay the Nemean Lion, whose skin was impenetrable to arrows.

15.     Plaintiff's expert Bulloch's exegesis of the stories contains several errors casting into doubt the thoroughness with which he was able to examine *God of War*.  For instance, Bulloch states that in both works, "a Spartan captain who was once fiercely loyal to Ares later turns on Ares and is instrumental in defeating Ares' aims of destroying Athens."  Docket No. 76-1 (Bulloch Report) at 11.  Firstly , Athens is destroyed in *God of War*.  Kratos thus does not defeat Ares's aim of destroying Athens.  He does kill Ares, but only after the conquest and destruction of Athens is complete.  Secondly, Kratos ceased being both a Spartan captain and loyal to Ares at least ten years prior to the events in *God of War*.  His rejection of Ares thus occurred well before Ares attacked Athens.  To take another example, Bulloch states, "In *God of War*, it is Athena, a goddess with magical powers, who appears to Kratos as he is in bed, with two sleeping nymphs, to bestow the quest upon the champion."  *Id.* at 14.  Firstly, Athena does not appear to Kratos while he is in bed; rather, he is awakened by nightmares and goes up to the deck of his ship.  There he accosts a statue of Athena, through which Athena speaks to him. Secondly, prior to going on deck, Kratos is not in bed with two sleeping nymphs; he is in bed with human twins.  Some of the descriptions of plaintiffs' works are also incorrect, for instance the following assertion: "Both the Dath Works and *God of War* depict a scene in which the gods are said to assemble at their Mount Olympus home, as the army of Ares readies its attack on Athens, to confer about the impending destruction before an enormous pool of water in which the image of a Spartan Commander appears."  *Id.* at 13.  In plaintiffs' works, no army of Ares is readying for battle when the gods gather; rather, a *Spartan* army is *retreating* in defeat from Athens and returning home for the winter.

16.     With rhetorical flourish, plaintiffs' counsel argues, "Neither coincidence nor common source can explain how in thousands of years of stories of Greek mythology, the same unique and original story elements appeared simultaneously in the Westside of Los Angeles in late 2002 and early 2003."  Pl.'s Opp. at 16.  As discussed above, these are not the same stories.  In view of the fact that Los Angeles is the center of the entertainment industry, it would have been extraordinarily surprising if no script featuring Greek mythological elements having some superficial similarity to what became *God of War* had been in circulation at that time.